Ronghua Guan, Esq. (SBN 333069)
ronghua@dgwllp.com
DGW KRAMER LLP
777 S. Alameda St. 2nd Floor
Los Angeles, CA 90021
Telephone: (213) 592-1908

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

HAIXU XIA, an individual, LIN ZHU, an individual, YINU SHI, an individual, CHENGFANG WANG, an individual, HAICHUN ZHU, an individual, XIAOFENG HAN, an individual, XIAOJIE JIANG, an individual, HUILING ZHANG, an individual, JIARUI LI, an individual, ZHENGFANG DING, an individual, MIN ZHU, an individual, JINGBO HUANG, an individual, HAILI ZHU, an individual, ZECHAO XU, an individual, LI LI, an individual, LIMEI CAO, an individual, CHUNYAN XI, an individual, YIKAI JU, an individual, JING GAO, an individual, YOUYOU ZHOU, an individual, JIEYU WEN, an individual, MAN LANG, an individual, CUNMING QIAN, an individual, DONGXIAO WANG, an individual, DONGYU YU, an individual, CHENJUAN LU, an individual, NENG DAI, an individual, QIANYA SI, an individual, BIN WANG, an individual, MENGYING HUANG, an individual, ERZHI ZHOU, an individual, HAO WANG, an individual, LINGYUN SHI, an individual, SIYUAN WANG, an

Case No.:

**COMPLAINT:**

**(1) DECLARATORY RELIEF**
**(2) SECURITIES FRAUD VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT**
**(3) CONTROL PERSON LIABILITY SECTION 20(a) OF THE EXCHANGE ACT**
**(4) SECURITIES FRAUD – VIOLATION OF CALIFORNIA CORPORATE CODE § 25401**
**(5) FRAUD**
**(6) NEGLIGENT MISREPRESENTATION**
**(7) BREACH OF FIDUCIARY DUTIES**
**(8) BREACH OF CONTRACT**
**(9) CIVIL RICO LIABILITY**
**(10) ACCOUNTING**

**DEMAND FOR JURY TRIAL**

1

COMPLAINT

individual, XIANG WANG, an individual, HAO ZHOU, an individual, YIXIN LIN, an individual, GANG WU, an individual, BO CHEN, an individual, JIALIN SHI, an individual, YIXIN ZANG, an individual, WENDI LIU, an individual, ENMING LU, an individual, LINFENG YU, an individual, and FANGFANG TAN, an individual,

Plaintiffs,

vs.

VINCENT CHEN aka ZHAOXU CHEN, an individual, GRANT W. KING, an individual, SCOTT BARRACK, an individual, JASON CHEN, an individual, 6417 DREAM LENDER LP, a California Limited Partnership, 6417 SELMA LP, a Delaware Limited Partnership, 6417 SELMA HOTEL, LLC, a Delaware Limited Liability Company, HIRC 6417 DREAM LENDER GP, LLC, a California Limited Liability Company, HOLLYWOOD INTERNATIONAL REGIONAL CENTER SELMA, LLC, a Delaware Limited Liability Company, 6417 SELMA HOLDINGS LLC, a Delaware Limited Liability Company, 6421 SELMA RESTAURANT LLC, a Delaware Limited Liability Company, 1601 CAHUENGA NIGHTCLUB LLC, a Delaware Limited Liability Company, HOLLYWOOD INTERNATIONAL REGIONAL CENTER LLC, a Delaware Limited Liability Company, LCP HOLLYWOOD LENDER LLC, a New York Limited Liability Company, RELEVANT GROUP LLC, a Delaware

2

COMPLAINT

Limited Liability Company, DOES 1-10, inclusive, and XYZ Corps. 11-20, inclusive,

Defendants.

COMPLAINT

Plaintiffs, HAIXU XIA, LIN ZHU, YINU SHI, CHENGFANG WANG, HAICHUN ZHU, XIAOFENG HAN, XIAOJIE JIANG, HUILING ZHANG, JIARUI LI, ZHENGFANG DING, MIN ZHU, JINGBO HUANG, HAILI ZHU, ZECHAO XU, LI LI, LIMEI CAO, CHUNYAN XI, YIKAI JU, JING GAO, YOUYOU ZHOU, JIEYU WEN, MAN LANG, CUNMING QIAN, DONGXIAO WANG, DONGYU YU, CHENJUAN LU, NENG DAI, QIANYA SI, BIN WANG, MENGYING HUANG, ERZHI ZHOU, HAO WANG, LINGYUN SHI, SIYUAN WANG, XIANG WANG, HAO ZHOU, YIXIN LIN, GANG WU, BO CHEN, JIALIN SHI, YIXIN ZANG, WENDI LIU, ENMING LU, LINFENG YU, and FANGFANG TAN (collectively, the "Plaintiffs"), by and through their undersigned counsel, file this Complaint against Defendants VINCENT CHEN aka ZHAOXU CHEN ("Chen"), GRANT W. KING ("King"), SCOTT BARRACK ("Barrack"), JASON CHEN ("Jason"), 6417 DREAM LENDER LP ("Dream Lender LP"), 6417 SELMA LP ("Selma LP"), 6417 SELMA HOTEL, LLC ("6417 Hotel LLC" or the "Borrower"), HIRC 6417 DREAM LENDER GP, LLC ("6417 GP"), HOLLYWOOD INTERNATIONAL REGIONAL CENTER SELMA LLC ("HIRC Selma"), 6417 SELMA HOLDINGS LLC ("6417 Holdings"), 6421 SELMA RESTAURANT LLC ("6421 Restaurant"), 1601 CAHUENGA NIGHTCLUB LLC ("1601 Nightclub"), HOLLYWOOD INTERNATIONAL REGIONAL CENTER LLC ("HIRC"), LCP HOLLYWOOD LENDER LLC ("LCP"), and RELEVANT GROUP LLC ("RG") (collectively, the "Defendants") and allege as follows:

## **INTRODUCTION**

1. Plaintiffs are participants in the Immigrant Investor Program (the "EB5 Program"), as administered by the United States Citizenship and Immigration Services (the "USCIS").

2. This action arises from Defendants' exploitation of Plaintiffs' desire to immigrate to the United States and the EB5 Program which is designed to stimulate the economy by allowing such immigration in exchange for foreign investments that

promote job growth in the United States.  Specifically, Defendants took more than $94.9 million dollars from Plaintiffs which would purportedly be invested in an EB5 Program based in the Hollywood area of Los Angeles, California called the Hollywood Starlight World, specifically Phase I and Phase V, which involved the development and construction of a hotel, restaurant, and nightclub complex (the "Project") and, through a series of securities violations, fraudulent misrepresentations, contractual, and fiduciary breaches enriched only themselves.

3. As demonstrated herein, Defendants Chen and King, acting through entity defendants under their ownership and control, and with the assistance of Defendants Barrack and Jason, facilitated an affiliated lender's acquisition or origination of a senior secured loan relating to the Project.  Defendants intentionally orchestrated a loan default, followed by an insider foreclosure process that, in accordance with Defendants' scheme, effectively extinguished the equity interests of the Plaintiffs and approximately 126 of their fellow EB-5 investors.

4. Defendants' scheme was to unlawfully wipe out no less than $94.9 million in investor capital, while transferring sole ownership and control of the Project to Chen and his affiliates for their own benefit (the "Scheme").  After USCIS terminated HIRC, Defendants continued communicating with investors regarding the Project but failed to disclose the termination or its consequences for investors' EB5 immigration status. .

5. Defendants' conduct constitutes, inter alia, violations of Securities Exchange Act of 1934 (the "Exchange Act"), California "Blue Sky" laws, common-law fraud, breach of fiduciary duties, self-dealing, and a coordinated scheme to deprive Plaintiffs and similarly situated investors of their investments.  Consequently, Plaintiffs seek remedies including but not limited to rescission, compensatory and consequential damages, disgorgement of ill-gotten gains, a full accounting, and appropriate injunctive remedies to redress the loss of their investment capital and the inevitable loss of their immigration benefits due to the collapse of the Project prior to the conclusion of their immigration petitions.

COMPLAINT

## THE PARTIES

**A. The Plaintiffs**

6.  Plaintiffs are all foreign nationals and citizens of the People's Republic of China (the "PRC").  Plaintiffs each invested at least $500,000, plus an administrative fee of $45,000 for Selma LP Plaintiffs (as defined below), and $55,000 for Dream Lender LP Plaintiffs (as defined below), pursuant to the requirements of the EB5 Program in the Project as same was offered, marketed, promoted, operated and managed by the Defendants.  Specifically, Plaintiffs invested in the "Phase I – Dream Hotel" and "Phase V – Tao Restaurant" portions of the Project.

7.  The "Selma LP Plaintiffs" are Plaintiffs who invested in the "Phase I – Dream Hotel" portion of the Project.  Specifically, the Selma LP Plaintiffs are Haixu Xia, Lin Zhu, Yinu Shi, Chengfang Wang, Haichun Zhu, Xiaofeng Han, Xiaojie Jiang, Huiling Zhang, Jiarui Li, Zhengfang Ding, Min Zhu, Jingbo Huang, Haili Zhu, Zechao Xu, Li Li, Limei Cao, Chunyan Xi, Yikai Ju, Jing Gao, Youyou Zhou, Jieyu Wen, Man Lang, Cunming Qian, Dongxiao Wang, Enming Lu, Linfeng Yu, and Fangfang Tan.  As is explained in greater detail *infra.*, the Selma LP Plaintiffs' investments were provided in exchange for limited partnership interests in Defendant Selma LP, and Selma LP's business purpose was to use the investment capital to make an equity investment into the Dream Hotel portion of the Project for purposes of development, construction, and operation.

8.  The "Dream Lender LP Plaintiffs" are Plaintiffs who invested in the "Phase V – Tao restaurant" portion of the Project. Specifically, the Dream Lender LP Plaintiffs are Dongyu Yu, Chenjuan Lu, Neng Dai, Qianya Si, Bin Wang, Mengying Huang, Erzhi Zhou, Hao Wang, Lingyun Shi, Siyuan Wang, Xiang Wang, Hao Zhou, Yixin Lin, Gang Wu, Bo Chen, Jialin Shi, Yixin Zang, and Wendi Liu.  As is explained in greater detail *infra.*, Dream Lender LP Plaintiffs' investments were provided in exchange for limited partnership interests in Defendant Dream Lender LP, which business purpose was to use the investment capital to make a loan to Defendant 6417 Hotel LLC to pay

COMPLAINT

down an existing senior debt and finance the hotel, restaurant, event space, and nightclub components of the Project.

**B. The Defendants**

9. Defendant Vincent Chen, also known as Zhaoxu Chen, is an individual who resides in Los Angeles, California. Upon information and belief, his address for service is 454 S. Muirfield Rd., Los Angeles, CA 90020. Chen controlled the investor pipeline in the PRC from which investment capital was obtained. At all times relevant, Chen was a principal, manager, and/or controlling person of the Project, non-party Huijia Investment Consulting (Shanghai) Co., Ltd., d/b/a Visas Consulting Group ("VCG"), and Defendants HIRC and RG. Chen and his fellow defendants King and Barrack utilized these entities, and the other entities involved in the Project as Chen's alter-egos to effectuate the Scheme.

10. Defendant Grant W. King is an individual who, upon information and belief, resides in Los Angeles, California, with his principal address located at 1605 N. Cahuenga Blvd, Los Angeles, CA 90028. King executed the development of the Project here in California. At all times relevant, King was a principal, manager, and/or controlling person of Defendants RG, HIRC Selma and HIRC, and the Project. King was an instrument of and worked in concert with Chen to execute the Scheme.

11. Defendant Scott Barrack is an individual who, upon information and belief, resides in Los Angeles, California. Barrack provided the PRC operational base and institutional prestige to boost the marketing of the Project. At all times relevant, Barrack was a principal, manager, and/or controlling person of Defendants RG and HIRC, and non-party Space Global Real Estate ("Space Global"). At all times relevant, Barrack held himself out as the "China director for [RG]'s EB-5 entity" and provided on-the-ground infrastructure in the PRC to aid in the marketing of the Project and solicitation of investors in furtherance of the Scheme. Barrack was an instrument of and worked in concert with Chen and King to execute the Scheme.

12. Defendant Jason Chen is an individual who, upon information and belief,

COMPLAINT

resides in Los Angeles, California, with his principal address located at 7653 Balasiano Ave, Canoga Park, CA 91304.  Upon information and belief, Defendant Jason is Defendant Chen's brother.  At all times relevant, Defendant Jason has acted as the California-based registered agent for Defendants Dream Lender LP, Selma LP, 6417 Hotel LLC, 6417 GP, HIRC Selma, 6417 Holdings, 6421 Restaurant, 1601 Nightclub, HIRC, and RG.  Jason was an instrument of and worked in concert with Chen and King to execute the Scheme.

13. Defendant 6417 Dream Lender LP is a California limited partnership with its principal place of business located at 1605 N. Cahuenga Blvd, Los Angeles, CA 90028. Defendant Dream Lender LP is the issuer of securities to and was the entity through which the Dream Lender LP Plaintiffs' investment capital was purported invested in the Project.  At all times relevant, Defendant Dream Lender LP acted as an alter ego of Chen and King and their affiliates.

14. Defendant 6417 SELMA LP is a Delaware limited partnership with its principal place of business located at 1605 N. Cahuenga Blvd, Los Angeles, CA 90028. Defendant Selma LP is the issuer of securities to and was the entity through which the Selma LP Plaintiffs' investment capital was purportedly invested in the Project.  At all times relevant, Defendant Selma LP acted as the alter ego of Chen and King and their affiliates.

15. Defendant 6417 Selma Hotel LLC is a Delaware limited liability company with its principal place of business located at 6417 Selma Avenue, 2nd Floor, Los Angeles, CA 90028.  Defendant 6417 Hotel LLC was the borrower of the purported loan of investors' capital from Defendant Dream Lender LP and the Project-level operating or borrower entity into which investors' capital from Defendant Selma LP was contributed.  At all times relevant, Defendant 6417 Hotel LLC acted as an alter ego of Chen and King and their affiliates.

16.  Defendant HIRC 6417 Dream Lender GP, LLC is a California limited liability company with its principal place of business located at 1605 N. Cahuenga Blvd, Los

8

COMPLAINT

Angeles, CA 90028.  Defendant 6417 GP is the general partner of Defendant Dream Lender LP and partial owner of 6417 Hotel LLC.  Defendant 6417 GP is owned 100% by HIRC. At all times relevant, Defendant 6417 GP acted as an alter ego of Chen and King and their affiliates.

17.  Defendant Hollywood International Regional Center Selma LLC is a Delaware limited liability company with its principal place of business located at 1605 N. Cahuenga Blvd, Los Angeles, CA 90028.  Defendant HIRC Selma acted as the EB-5 Equity Manager and the general partner of Defendant Selma LP in connection with Phase I of the Project, and the EB-5 Equity Manager and manager of Defendant 6417 Hotel LLC in connection with Phase V of the Project.  At all times relevant, Defendant HIRC Selma acted as an alter ego of Chen and King and their affiliates.

18.  Defendant 6417 Selma Holdings LLC is a Delaware limited liability company with its California based principal place of business located at 6417 Selma Avenue, 2nd Floor, Los Angeles, CA 90028.  Defendant 6417 Holdings purportedly owned and operated the Hotel portion of the Project.  At all times relevant, Defendant 6417 Holdings acted as an alter ego of Chen and King and their affiliates.

19. Defendant 6421 Selma Restaurant LLC is a Delaware limited liability company, with its California based principal place of business located at 6417 Selma Avenue, 2nd Floor, Los Angeles, CA 90028.  Defendant 6421 Restaurant purportedly owned and operated the Restaurant portion of the Project, into which portion of the Project Plaintiffs invested their capital.  At all times relevant, Defendant 6421 Restaurant acted as an alter ego of Chen and King and their affiliates.

20. Defendant 1601 Cahuenga Nightclub LLC is a Delaware limited liability company with its California principal place of business located at 6417 Selma Avenue, 2nd Floor, Los Angeles, CA 90028.  Defendant 1601 Nightclub purportedly owned and operated the Nightclub portion of the Project.  At all times relevant, Defendant 1601 Nightclub acted as an alter ego of Chen and King and their affiliates.

21. Defendant Hollywood International Regional Center LLC is a Delaware limited

9

COMPLAINT

liability company with its California principal place of business located at 6417 Selma Avenue, 2nd Floor, Los Angeles, CA 90028.  Defendant HIRC is the manager of 6417 GP with 100% ownership, and is partly owned and controlled by Defendant RG f/k/a Five Chairs Holdings, LLC. Defendant HIRC purportedly acted as a USCIS accredited sponsoring regional center for the Project.  At all times relevant, Defendant HIRC acted as an alter ego of Chen and King and their affiliates.

22. Defendant LCP Hollywood Lender LLC is a New York limited liability company with its principal place of business located at 50 Main Street, Suite 1410, White Plains, NY 10606.  Defendant LCP purportedly acted as the senior secured lender for the Project and was the entity through which the Scheme was ultimately consummated.  At all times relevant, Defendant LCP acted as an alter ego of Chen and King and their affiliates.  Defendant LCP's registered agent for service in California is CSC - Lawyers Incorporating Service, located at 2710 Gateway Oaks Drive Ste 150N, Sacramento, CA, c/o Rebecca Vang.

23. Defendant Relevant Group LLC, f/k/a Five Chairs Holdings LLC, is a Delaware limited liability company with its California based principal place of business located at 6417 Selma Avenue, 2nd Floor, Los Angeles, CA 90028.  Defendant RG is the managing member of Defendant HIRC, through which Defendant RG also manages Defendant 6417 GP. Defendant RG was purportedly involved in the management, development, and control of the Project and all associated assets.  At all times relevant, Defendant RG acted as an alter ego of Chen and King and their affiliates.

24. Upon information and belief, defendants John Does 1 – 10 are fictitious names; Plaintiffs hereby reserve their right to amend the Complaint as a result of pleading a fictitious party. Defendants John Does 1 – 10 are yet unknown natural persons who may have contributed to the damages sustained by the Plaintiffs but who are yet unknown or not necessarily yet germane to the allegations in this Complaint.

25. Upon information and belief, defendants XYZ Corp., 11 – 20 are fictitious names; Plaintiffs hereby reserve their right to amend the Complaint as a result of

10

COMPLAINT

pleading a fictious party. Defendants XYZ Corp., 1 – 10 are entities that may have contributed to the damages sustained by the Plaintiffs but that are yet unknown or not necessarily yet germane to the allegations in this Complaint.

**C. Relevant Non-Parties**

26. Non-party Huijia Investment Consulting (Shanghai) Co., Ltd., d/b/a Visas Consulting Group is a Chinese corporation with its principal place of business located in, upon information and belief, Shanghai, PRC. VCG is a massive migration agency which provided the investor pipeline from which Defendants obtained victims for the Scheme. VCG acted as an agent on behalf of the other Defendants for the Project in the PRC, marketing the Project to Plaintiffs and disseminating communications concerning the Project to Plaintiffs in order to solicit their investments. At all times relevant, Defendant Chen was the director, manager, and/or controlling person of VCG.

27. Non-party Colony NorthStar, Inc. (now DigitalBridge Group, Inc.) is a corporation publicly traded on the New York Stock Exchange for which Defendant Barrack acts as the "China Director," while his brother, Thomas Barrack Jr., acts as the Executive Chaiman of the Board. Colony NorthStar made a minority equity investment in Defendant RG in December 2016. Colony NorthStar was used by Defendant Barrack to add prestige and legitimacy to the Project in furtherance of the Scheme through its purported "partnership" with Defendant RG.

28. Non-party Space Global Real Estate is a Chinese Corporation with its principal place of business located in, upon information and belief, Shanghai, PRC. Defendant Barrack is the founder and Managing Director of Space Global. Defendant Barrack operated out of Shanghai through Space Global. Space Global publicly represented that Defendant HIRC was its "U.S. Partner."

**JURISDICTION AND VENUE**

29. This Court has personal jurisdiction over all of the Defendants because they are domiciled and reside within this judicial district or they have sufficient minimum contacts with this judicial district and the United States in general, and they have

COMPLAINT

purposefully availed themselves of this judicial district's jurisdiction by conducting significant business operations in this judicial district.

30. Defendants Chen, King, Barrack, and Jason are individuals who are domiciled and reside within this judicial district.

31. Defendants Dream Lender LP, Selma LP, 6417 Hotel LLC, 6417 GP, HIRC Selma, 6417 Holdings, 6421 Restaurant, 1601 Nightclub, HIRC, LCP, and RG are, and at all relevant times were, business entities duly organized and/or registered to do business in the State of California, including specifically Los Angeles County. Defendants Dream Lender LP, Selma LP, 6417 Hotel LLC, 6417 GP, HIRC Selma, 6417 Holdings, 6421 Restaurant, 1601 Nightclub, HIRC, LCP, and RG regularly conduct, and have continuously conducted, substantial business within the State of California and this judicial district, and have purposefully availed themselves of the privileges of conducting activities herein.

32. Defendant LCP purposefully directed its business activities toward the State of California and Los Angeles County, Plaintiffs' claims specifically arise from and are related to those activities.  Defendant LCP, acting as the purported independent senior secured lender, made, acquired, serviced, and/or enforced an alleged loan secured by real property located within Los Angeles County, conducted or caused to be conducted foreclosure proceedings against the Project and the real property located in Los Angeles County.

33. This Court has subject matter jurisdiction because this action arises under Defendants' violations of the Exchange Act, including Section 10(b) and Rule 10b-5, based on Plaintiffs' purchases of limited partnership interests and Defendants' material misrepresentations, omissions, and deceptive course of conduct in connection with those purchases and subsequent lulling/concealment communications. Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

COMPLAINT

This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 78aa(a), and supplemental jurisdiction over Plaintiffs' pendent state-law claims pursuant to 28 U.S.C. § 1367(a). Plaintiffs further plead that later investor communications, extension requests, foreclosure communications, deed-in-lieu communications, and release/Capital Priority Return communications are relevant to scienter, concealment, discovery, equitable tolling where available, and the continuing scheme, without conceding that any federal limitations or repose period began to run before Plaintiffs discovered or reasonably should have discovered Defendants' fraud and the Scheme.

34. Venue is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because: 1) a substantial part of the events, acts, and omissions giving rise to the claims occurred in this judicial district and the real property that is the subject of this action is located in this judicial district, and 2) Defendants Chen and King reside in this judicial district and all of the Defendants are subject to personal jurisdiction here.

35. Plaintiffs are properly and permissively joined under Federal Rule of Civil Procedure 20(a)(1) because their claims arise out of the same transaction, occurrence, series of transactions, or series of occurrences: the financing, development, management, operation, foreclosure, deed-in-lieu, restructuring, and investor-communication history of the Project, controlled by overlapping Defendants and affiliated entities. Although Plaintiffs invested through different corporate entities, those entities are alleged to be alter egos of the same individual Defendants and of each other. Plaintiffs' investments flowed to the same corporate entity and were purportedly used to finance the Project under the same EB5 Program, and Plaintiffs were all victims of the Scheme itself, consequently common questions of law and fact predominate at the pleading stage, including Defendants' control of the Project and all related entities, Defendants' operation of those entities as alter egos to effectuate the same fraudulent scheme, the truth or falsity of Defendants' investor-facing statements, the purpose and

COMPLAINT

effect of the process by which Plaintiffs' equity was wiped out, the handling of investor capital, and the impact on Plaintiffs' EB5 immigration petitions and status.

## FACTUAL BACKGROUND

**A. The EB5 Program**

36. Plaintiffs were foreign citizens of the PRC who wished to immigrate with their families to the United States.

37. The EB-5 Program was created by the Immigration Act of 1990 and is administered by USCIS. Congress established the EB-5 Program to stimulate the U.S. economy by giving immigrant investors the opportunity to permanently live and work in the United States after they have invested in a new commercial enterprise (''NCE''). In the case of an NCE that is located in a Targeted Employment Area ("TEA") (*i.e.,* either a rural area or an area beleaguered by high unemployment) the required equity investment is $500,000.

38. EB-5 Programs that are administered by a regional center are more readily marketable. The administration of a regional center provides more flexibility and options for the prospective immigrant because the immigrant investor who invests in such an EB5 Program is permitted to take credit not only for direct jobs created in the NCE but also "indirect jobs" created outside the NCE in a job creating enterprise ("JCE"), such as a construction contracting firm that builds an improvement for the NCE. In addition, the immigrant investor need not handle the day-to-day management of the NCE or even necessarily reside in the region where the NCE is located.

39. Under the EB-5 Program, the immigrant investor first applies for an immigrant visa by submitting a Form I-526, Immigrant Petition for Alien Entrepreneur. USCIS' approval of the I-526 is conditioned upon the immigrant's investment of the requisite amount of money in an NCE that satisfies the applicable legal requirements. Upon approval of the I-526 petition, the immigrant investor may either: (1) file the appropriate form to adjust their status to a conditional permanent resident within the United States; or (2) file an application to obtain an EB-5 visa for admission to the

COMPLAINT

United States. Upon approval of the application or upon entry into the United States with an EB-5 immigrant visa, the EB-5 immigrant investor and family members will be granted conditional permanent residence for a two-year period.

40. To remove the conditional resident status, the immigrant investor must file a Form I-829, Petition by Entrepreneur to Remove Conditions, ninety days before the two-year anniversary of the granting of the EB-5 immigrant investor's conditional resident status. USCIS' approval of the I-829 is conditioned upon proof that the immigrant investor's investment has created at least ten full-time jobs in the NCE or JCE.

**B. The Project Offering and Corporate Structure**

41. Beginning in or around 2012, Defendants Chen and King, acting through various entities including non-party VCG, and Defendants HIRC, HIRC Selma, Selma LP, Dream Lender LP, and Project-level affiliates, began to solicit foreign investors for an EB-5 development project to be based in the Hollywood area of Los Angeles, the TEA for the Project. The Project was marketed to prospective immigrant investors as the "Hollywood International EB-5 Project" or "Hollywood Starlight World," and involved the development of a 179-room Dream Hotel (the "Hotel") at 6417 West Selma Avenue, a 20,000 square-foot Tao Restaurant (the "Restaurant") at 6421 West Selma Avenue, and a 4,000 square-foot nightclub (the "Nightclub") at 1601 Cahuenga Boulevard in Los Angeles, California.

42. Defendants used at least two separate fund-raising structures for the Project: (1) for the earlier Phase I, Defendants created and utilized Defendant Selma LP's equity/NCE structure; and (2) for the later Phase V, Defendants created and utilized Defendant Dream Lender LP's loan/NCE structure.

43. In order to make their investments and begin the EB-5 process, prospective investors, including each Plaintiff, had to sign a Subscription Agreement and complete an investor suitability evaluation (the "Subscriptions"), partnership agreements and/or joinders, and wire/escrow instructions specific to the Phase of the Project into which

they invested (the "Agreements"). Selma LP Plaintiffs' Subscriptions provided that they had to purchase limited partnership interests in Defendant 6417 Selma LP and provide payment of a $500,000 investment capital contribution plus a $45,000 administrative fee. Dream Lender LP Plaintiffs' Subscriptions provided that they had to purchase limited partnership interests in Defendant Dream Lender LP and provide payment of a $500,000 investment capital contribution plus a $55,000 administrative fee.

44. The Selma LP Plaintiffs signed their Subscriptions and partnership agreements between August 2, 2013 (the earliest in time) and July 23, 2015 (the latest in time). They provided their investment capital either concurrently or a few days after they signed their respective Subscription and partnership agreements. Pursuant to the Agreements, the Selma LP Plaintiffs were admitted as limited partners of Defendant Selma LP the same day that their investment capital was provided, however in some cases there was a lag between the provision of capital and Defendant HIRC Selma's acceptance signature.

45. The Dream Lender LP Plaintiffs signed their Subscriptions and partnership agreements between October 21, 2016 (the earliest in time) and July 31, 2017 (the latest in time). They provided their investment capital either concurrently or a few days after they signed their respective Subscription and partnership agreements. Pursuant to the Agreements, the Dream Lender LP Plaintiffs were admitted as limited partners of Defendant Dream Lender LP the same day that their investment capital was provided, however in some cases there was a lag between the provision of capital and Defendant 6417 GP's acceptance signature.

46. The Project was not structured through the use of a single NCE. For the Selma LP Plaintiffs, their investment capital was purported to initially flow through Defendant Selma LP, which functioned as the NCE for the Project. Selma LP Plaintiffs were offered to purchase limited partnership interests in Selma LP through a $500,000 capital contribution, plus a $45,000 administrative fee. The offering further

represented that Selma LP would invest the proceeds raised from investors in connection with the development, construction, and financing of the Project through Defendant 6417 Hotel LLC. The Private Placement Memorandum dated July 23, 2013 (the "Phase I PPM"), states that Selma LP expects to make an investment of $36,000,000 in 6417 Hotel LLC. For the Dream Lender LP Plaintiffs, the Private Placement Memorandum (the "Phase V PPM" and together with the Phase I PPM, the "PPMs") dated September 20, 2016, states that Defendant Dream Lender LP sought to raise up to $44,000,000 by offering up to 88 limited partnership interests at $500,000 each, plus a $55,000 administrative fee, and that Defendant Dream Lender LP was formed to make a loan to Defendant 6417 Hotel LLC and that Defendant 6417 Hotel LLC would use the loaned proceeds to pay down existing senior debt and to finance the Project.

47. Article 1.4 of the partnership agreement signed by the Selma LP Plaintiffs states that Defendant Selma LP's business was to make an equity investment into Defendant 6417 Hotel LLC for the purpose of developing, constructing, managing, and operating the Hotel portion of the Project (the "Selma Investment"). The Selma Investments were secured by Selma LP's purported ownership of 6417 Hotel LLC's equity (the "Equity Collateral").

48. Article 1.4 of the partnership agreement signed by the Dream Lender Plaintiffs explicitly provided that Plaintiffs' investment capital would be used by Dream Lender LP to make a loan to Defendant 6417 Hotel LLC (the "LP Loan"), which would in turn distribute the proceeds of the LP Loan to three subsidiaries wholly owned by 6417 Hotel LLC, for purposes of paying down an existing senior loan and to provide financing for the development and construction of the Hotel, the Restaurant, and the Nightclub. The subsidiaries wholly owned by Defendant 6417 Hotel LLC are Defendants 6417 Holdings, 6421 Restaurant, and 1601 Nightclub, with 6417 Holdings owning the Hotel portion of the Project, and 6421 Restaurant owning the Restaurant portion of the Project. Defendant 1601 Nightclub owned the Nightclub portion of the

17

COMPLAINT

Project, but did not possess title to any real estate.  This is also reflected in the Phase V PPM itself.

49. The Phase V PPM explicitly represented that the LP Loan would be secured by the pledge of a subordinated second lien deed of trust on certain collateral, specifically the real property held by Defendant 6417 Holdings where the Hotel would be developed as well as a pledge of Defendant 6417 Hotel LLC's right to receive distributions from the three subsidiaries, Defendants 6417 Holdings, 6421 Restaurant, and 1601 Nightclub (the "Loan Collateral," and together with the Equity Collateral, the "Loan and Equity Collateral").

50. The Phase V PPM further represented that the first $5 million of investment capital had to be used to pay down the senior loan and that later proceeds could be used for the Project's costs or additional senior-loan reduction, while also disclosing a substantial development fee and administrative fee totaling $55,000 which would be provided to an affiliate of Defendant HIRC, namely the general partner of Dream Lender LP, Defendant 6417 GP.

51. Notably, the Phase V PPM provided that Defendant 6417 GP may use part or all of the Administrative fee to pay commissions to immigration brokers in the PRC. As discussed at greater length *infra.*, Defendants Chen and Barrack, through non-party's VCG and Global Space, were the parties who acted as the immigration brokers in the PRC, actively marketing, soliciting, and securing investments from prospective immigrants in the PRC.

52. The corporate structure was highly integrated and controlled by Defendants Chen, King, and Barrack. The General Partner of Defendant Selma LP was Defendant HIRC Selma, whose sole member and manager was Defendant HIRC.  The General Partner of Defendant Dream Lender LP was Defendant 6417 GP, whose sole member and manager was Defendant HIRC. Defendant King served as the Principal of Defendant HIRC. Defendant 6417 Hotel LLC was managed by Defendant HIRC Selma, an affiliate of Defendant 6417 GP.  HIRC was managed by Defendant RG,

referred to at the time as Five Chairs Holdings LLC, which in turn meant that RG and its managers had control over 6417 GP, Selma LP, HIRC Selma, 6417 Hotel LLC, and the other entities involved with the Project.

53. The Phase V PPM also represented that, in addition to the $5 million taken from the investment capital for use in paying down the senior loan, that an additional $6.5 million "development fee" was to be taken out of the investment capital and paid directly to "an affiliate of the General Partner" – that affiliate was Defendant RG, known at the time as Five Chairs Holdings LLC – the owner of Defendant Dream Lender LP's general partner, Defendant 6417 GP and the sole member of Defendant HIRC, the controller of Defendant Selma LP's general partner Defendant HIRC Selma.

54. Defendant King further represented that in addition to himself, Richard Heyman ("Heyman") was involved with the management and control of the Project, specifically that Heyman was one of the principals of Defendant RG.

55. Defendants Chen, King, and Barrack represented that the total cost of the Project would be $96 million, and that total payment of that total cost would consist of $52 million in shareholder equity, $20 million to be raised from EB-5 investors, and $24 million in bank financing.   In reality, Defendants Chen, King, and Barrack **intentionally heavily oversold the Project and obtained more than four (4) times the represented investment capital from victim immigrant investors such as Plaintiffs**. Ultimately, 171 Chinese investors were induced to invest approximately $94.9 million in the Project.

56. The Phase V PPM also disclosed that Defendant Selma LP was the "EB-5 Equity Owner" of Defendant 6417 Hotel LLC and states that Defendant Selma LP contributed approximately $48 million to the Project and Defendant 6417 Hotel LLC as part of the Selma Investment.

57. Defendant King affirmatively misrepresented his experience with the development, marketing, and operation of hospitality businesses. The PPMs represented that Mr. King "brings more than 18 years" (Phase V PPM) or "19 years"

COMPLAINT

(Phase I PPM) "of luxury residential investment and development experience…Mr. King's resume of projects ranges from multi-million dollar custom homes to large-scale condominium and apartment complexes."  The PPMs further represented that Heyman brought "30 years of experience in the development of high-end, high-concept properties in Southern California." The Phase V PPM further described Heyman as "a pioneer and a major force in the resurgence of the City of Hollywood."

58. The PPMs touted and lauded the Project's purported reputation as a successful Los Angeles landmark, and that the Hollywood area was ripe for such a business endeavor.

59. Plaintiffs reasonably relied upon the representations in the PPMs, Partnership Agreements, Subscription Agreements, which representations were material to inducing their decision to invest in the Project.

60. In August 2012, four years prior to the initiation of investor solicitation for the Project, Defendant King filed for chapter 7 bankruptcy protection in this Judicial District and the matter was assigned case no.: 2:12-bk-39920 (the "King Bankruptcy"). The King Bankruptcy provided that King's co-debtor was Heyman.  The King Bankruptcy was concluded on January 10, 2013 following the issuance of a discharge.

61. The King Bankruptcy was *never* disclosed to Plaintiffs.

62. Moreover, Defendants never disclosed to Plaintiffs that USCIS had terminated the HIRC effective January 30, 2025. Certain investors learned of the termination through USCIS by letter dated September 25, 2025. Defendants' subsequent communications regarding the Project's financial condition, foreclosure, and restructuring efforts omitted any mention of the termination of HIRC or its consequences for Plaintiffs' EB5 investments and immigration benefits.

**C. The Undisclosed Chen-King-Barrack Partnership and Alter Ego Control**

63. While Defendant Chen and his affiliated entity, non-party VCG, acted as the primary agents soliciting Chinese investors in the PRC, Defendant Chen was not merely an independent overseas agent.  Defendant Chen's involvement with the Project

20

COMPLAINT

was not disclosed within the PPMs or any of the promotional materials provided to Plaintiffs.

64. Defendant Chen was the mastermind of the Scheme and a deeply embedded business partner of Defendants King, Barrack and Jason. Moreover, Defendant Chen is the majority equity holder of Defendant RG. Defendants King and Chen are two of the three members of Defendant RG's board of managers.

65. Chen's majority stake in RG coupled with Chen and King comprising the majority of RG's Board of Managers, confirms that Chen held majority voting control over Defendant RG. Defendant RG is the parent entity that controlled Defendants HIRC, HIRC Selma, 6417 GP, and all project subsidiaries. Chen and King's control over RG gave them total control over the entire corporate structure associated with the Project.

66. The Phase V PPM disclosed that HIRC owned 6417 GP and would control Dream Lender LP as a result. The Phase V PPM also disclosed that RG, under its former name, Five Chairs Holdings LLC, was the managing member of HIRC and therefore owned 6417 GP.

67. The partnership agreement for Defendant Selma LP disclosed that HIRC owned HIRC Selma and would control Selma LP as a result. The partnership agreement for Selma LP also disclosed that RG, under its former name, Five Chairs Holdings LLC, was the managing member of HIRC and therefore owned Selma LP.

68. The PPMs make no mention of Defendant Barrack. Despite this, Defendant Barrack was instrumental in providing the PRC operational base for Chen and King and the institutional prestige to boost the marketing of the Project and entice more investor victims. Barrack also held himself out as the "China director for [RG]'s EB-5 entity" and provided on-the-ground infrastructure in the PRC to aid in the marketing of the Project and solicitation of investors in furtherance of the Scheme through the use of Barrack's entity Space Global.

69. In addition to Barrack's contributions in the PRC, Barrack also provided access

COMPLAINT

to Colony NorthStar's portfolio and prestige within the hospitality development field. Moreover, Barrack was able to provide Defendant King and Chen with the use of Colony NorthStar's offices in California for the purpose of running local marketing campaigns where investors were hosted and wooed.

70. As it turns out, the Project was part of a much larger real estate development operation spearheaded by Chen and King. Chen and King, through RG, were also attempting to develop a related hotel and restaurant complex known as the "Citizen News Building" (the "Related Project").

71. The Related Project has been heavily embroiled in litigation. Sworn judicial admissions in related litigation confirm the partnership and coordination of action between Chen and King. In *Ten Five Hospitality LLC v. Relevant Group LLC*, case no.: 23STCV00738, the First Amended Complaint explicitly states that the management arrangement for the Related Project was negotiated with "Chen and King, who also are the Managers and majority equity holders of Relevant Group LLC and who control the other named Defendants." Defendant RG served as the parent developer entity for the Related Project. Defendant RG also served as the parent developer entity for the Project itself.

72. Moreover, Defendant HIRC acted as the payroll entity for the entire Related Project including providing retirement account and related contributions for employees associated with the Related Project, a role that is well outside the purview of a USCIS sponsored and approved EB5 Program regional center which is generally limited to the administration of immigrant investor funds and related immigration petitions.

73. Public records submitted to the California and Delaware Secretaries of State further corroborate that Chen and King jointly formed multiple undercapitalized shell entities to operate the Project, Dream Lender LP, Selma LP, 6417 Hotel LLC, 6417 GP, HIRC Selma, 6417 Holdings, 6421 Restaurant, 1601 Nightclub, RG, and HIRC, all of which are operating between two shared corporate headquarters at (1) 1605 N. Cahuenga Blvd, Los Angeles, CA 90028; and (2) 6417 Selma Avenue, 2nd Floor, Los

COMPLAINT

Angeles, CA 90028.  In addition to the shared addresses, all of those entities, except Selam LP, are listed as having the same registered agent – Defendant Jason, Defendant Chen's brother.

**D. The Scheme**

74. While Defendant Chen purportedly provided an $8 million loan to the Related Project, ultimately Chen's loan was lost and the Related Project served as the blueprint for the Scheme.

75. In or around November 2022, Defendant RG allegedly encountered financial troubles, which caused a mezzanine lender to institute foreclosure proceedings on two properties from the Related Project, based on a $72 million rescue loan RG had acquired a year prior in 2021.  In or around February 2023, the mezzanine lender completed the foreclosure proceedings and acquired the real properties thereby summarily wiping out any subordinate lenders' interests.

76. The pattern is identical across both the Related Project and the Project: high-cost rescue loans are arranged by insiders, the entities holding the associated real properties are allowed to fail, and the insiders capture the remaining value through foreclosure or management fee extraction thereby wiping out subordinate lenders such as Chen in relation to the Related Project and Plaintiffs in relation to the Project.  The Related Project supplied a model for the challenged restructuring of the Project.  As alleged below, Chen and King controlled the Project entities that approved the March 2023 senior financing; the financing placed a first-priority lien over assets and equity interests previously represented as protecting Plaintiffs; material terms and conflicts were withheld from Plaintiffs; the Project defaulted after the loan was imposed; and the resulting enforcement transferred the Project's principal value away from the entities in which Plaintiffs held interests.  These coordinated acts, separate and apart from the fraudulent communications, constitute the deceptive course of conduct underlying the Scheme.

77. Following the purported start of the Project in early 2017, in order to lull

COMPLAINT

Plaintiffs and their fellow investors into inaction, Defendants Chen, King, and Barrack disseminated regular "Project Progress Reports" to investors, including Plaintiffs. These Progress Reports consistently represented that the Project was performing well and generating revenues. These purposefully engineered communications were designed to lull Plaintiffs and their fellow investors into inaction, and are evidence of scienter, concealment, and an intentional design to delay discovery of the Scheme.

78. By July 30, 2021, Plaintiffs and their fellow investors were told distributions would be delayed because the Project remained under pressure from negative cash flow and outstanding accounts payables.

79. On November 23, 2021, Plaintiffs and their fellow investors were provided with a letter that informed them Defendant 6417 Hotel LLC, the borrower, had exercised a one-year extension of the LP Loan's maturity from December 7, 2021 to December 7, 2022. The letter and the extension reflect a material modification of Plaintiffs' investments insofar as their right to repayment was being deferred by a year. This modification was communicated to the Plaintiffs without disclosing the true state of the Project's finances.

80. On January 30, 2024, Defendant HIRC provided Plaintiffs with a letter that, for the first time, disclosed new senior refinancing which had closed almost a year prior to the distribution of the letter on March 20, 2023, and with that senior financing it had satisfied the prior senior loan, but that the proceeds were not sufficient to repay the LP Loan, and that the maturity date for the LP Loan would be pushed out again to April 1, 2028. This investor letter materially modified Plaintiffs' investments insofar as it disclosed their subordination, deferred their right to repayment by another 5 years, and was communicated without complete disclosures, which omissions are explained further below.

81. By design these Progress Reports omitted critical, adverse financial developments. On or about March 20, 2023, using the playbook gleaned from their experience in the Related Project, Defendants Chen, King, and Barrack, acting through

COMPLAINT

RG, HIRC, HIRC Selma, 6417 GP, and 6417 Hotel LLC, caused the Project to incur a senior loan of approximately $33.3 million from Defendant LCP (the "Fraudulent Loan"). The Fraudulent Loan was secured by a first-priority lien on the primary assets of the Project, including the real property held by Defendants 6421 Restaurant and 6417 Hotel LLC, subordinating Plaintiffs' equity positions as limited partners of both Selma LP and Dream Lender LP and the Loan and Equity Collateral pledged pursuant to the Selma Investment and LP Loan of Plaintiffs' investment capital to 6417 Hotel LLC. Plaintiffs allege that the Senior Loan was part of a concealed, conflicted restructuring because Chen and King controlled the borrower and the entities whose assets or interests were pledged, did not obtain the informed consent allegedly required by the governing agreements, did not disclose the material conflicts and priority consequences. LCP was part of the insider-controlled structure at all relevant times and knew of Plaintiffs' preexisting interests. By the time of the January 30, 2024 investor letter, LCP had already begun default proceedings against 6417 Hotel LLC and the Loan and Equity Collateral was subject to an already scheduled auction – neither of which was disclosed in that letter.

82. After the Fraudulent Loan closed, Chen and King continued to control the borrower and the Project entities responsible for servicing the debt, operating the Project, preserving the collateral, and communicating with investors. The ensuing default was not merely an unforeseen business failure but resulted from specific acts and omissions undertaken for Defendants' benefit. It was not until an October 2023 Progress Report that, for the first time, Defendant HIRC mentioned the Fraudulent Loan to Plaintiffs. However, and significantly, Defendant HIRC materially misrepresented purpose and effect of the Fraudulent Loan. The Progress Report stated only that the Fraudulent Loan was used to "repay other loans" and omitted critical facts that: (a) the Fraudulent Loan was a high-risk, senior-secured debt instrument; (b) the Fraudulent Loan placed the entire Project at risk of foreclosure upon any default; and (c) the need for such a loan was fundamentally inconsistent with Defendants' long-

COMPLAINT

standing representations of the Project's commercial profitability and financial sustainability.

83. In a Progress Report dated October 2025, Defendant HIRC disclosed, for the first time, a decline in revenue due to regional wildfires, but nevertheless represented that it remained "optimistic about future operations" of the Project.

84. The Progress Reports materially strengthen the chronology of Defendants' misrepresentations and omissions because they show repeated maturity extensions, delayed preferred returns, express notice that the Fraudulent Loan was insufficient to repay the LP Loan and was really nothing more than a veiled refinancing and further leveraging of the Project, and continued investor-facing operational reporting even in October of 2025.

85. Defendants Chen, King, and Barrack purposefully caused the Project to default on the Fraudulent Loan. On August 8, 2025, Defendant LCP caused a "Public Notice of UCC Article 9 Sale" to be published via DAILYDAC, announcing a private auction of the interests in 6421 Restaurant and 6417 Hotel LLC, scheduled for October 17, 2025, due to the failure to repay the Fraudulent Loan.  Again, in a breach of their fiduciary duties owed to Plaintiffs, Defendants Chen, King, and Barrack intentionally failed to disclose this default or the scheduled auction to the Plaintiffs.

86. On or about September 25, 2025, Plaintiffs received official notices from the USCIS that Defendant HIRC had been terminated as an approved regional center for failing to make required payments and was no longer sponsored by USCIS.

87. HIRC knew of its mandatory annual fee obligation, failed to pay by the applicable deadline, and failed to cure the delinquency within the statutory period. Upon information and belief, before formally terminating HIRC, USCIS issued a Notice of Intent to Terminate or other pretermination notice.  HIRC and its controlling persons therefore knew before September 25, 2025 that HIRC's regional-center designation was in jeopardy.  Defendants did not disclose HIRC's nonpayment, the pretermination proceedings, or the resulting risk to Plaintiffs' immigration petitions.

26

COMPLAINT

Instead, they continued to issue communications portraying the Project and its EB-5 administration as ongoing and viable.

88. Although HIRC's termination may not automatically invalidate Plaintiffs' pending or approved EB-5 petitions, it materially jeopardized their continued eligibility and required them to take timely corrective action to preserve those petitions. HIRC's termination, combined with the foreclosure and loss of the Loan and Equity Collateral, created a substantial risk that Plaintiffs would be unable to establish the qualifying investment and job creation required for approval of their petitions or removal of conditions.

89. Despite this termination and the ongoing foreclosure proceedings concerning the undisclosed Fraudulent Loan, Defendants Chen, King, and Barrack continued to send misleading communications to Plaintiffs and their fellow investors. On October 23, 2025, Defendant HIRC sent a letter stating that the Project had defaulted on a $33.3 million senior loan it secured in 2023, and that it had obtained a foreclosure forbearance from the senior lender, deferring foreclosure auction until November 11, 2025. The letter further presented that it was negotiating a recapitalization or a deed in lieu of foreclosure with the senior lender to preserve investors' rights, making no mention of the private UCC sale that had already been scheduled for October.

90. Subsequent letters in November and December 2025 claimed the foreclosure auction was postponed and that "asset restructuring" negotiations were underway. Specifically, a letter dated November 12, 2025, provided that the parties had entered into a "deed-in-lieu" and an amended Forbearance Agreement, which postponed the auction of the Loan and Equity Collateral until December 12, 2025. That letter also presented Plaintiffs with a new recapitalization plan based on an entirely new conditional prepayment rate than what Plaintiffs had agreed to in the Agreements. In essence, Plaintiffs were presented with yet another modification to their investments, namely the extinguishment of their interests in either Selma LP or Dream Lender LP in exchange for a right to participate in the new recapitalization plan. The letter did

COMPLAINT

not disclose the fact that the "deed-in-lieu" amendment contained provisions removing Plaintiffs' right to sue LCP and that the conditional repayment rate was structured in such a way as to make recovery of their investments impossible.

91. On January 9, 2026, Defendant King, acting on behalf of the defunct HIRC, sent a letter falsely claiming the "project was completed."

92. The foreclosure process culminated on February 19, 2026, when Defendant LCP took possession of the real property with the Dream Hollywood Hotel from Defendant 6417 Hotel LLC via a deed in lieu of foreclosure signed by Defendant King. This transfer wiped out Plaintiffs' equity interests in the hotel property and eliminated the Loan and Equity Collateral.  This result was the foreseeable consequence of the concealed Fraudulent Loan and engineered or knowingly permitted default because the financing placed LCP first in priority over the Plaintiffs' interest in the Project. Plaintiffs further allege that Chen, King, RG, HIRC, and their controlled entities benefited through the default and that LCP benefited by acquiring collateral.

93. Following the foreclosure by Defendant LCP, the remaining known asset(s) associated with the Project and by extension, Defendants Chen and King, is only the land underneath the Tao Restaurant (which King reportedly retained).  Upon information and belief, Defendants Chen and King still own assets associated with the Related Project such as the Citizen News Building at 1545 Wilcox Avenue, owned through Hollywood Citizen News Operating Company LLC.  Given the established pattern of undisclosed encumbrances and foreclosures, these remaining assets are at imminent risk of transfer or dissipation, threatening the investors' ability to recover their $94.9 million in lost capital.

**E. Plaintiffs' Reliance and Damages**

94. Upon information and belief, Plaintiffs justifiably relied on Defendants' misrepresentations, and other false and misleading communications made at the time of Defendants large scale investor solicitation in the PRC, at around 2013-2015, including through open informational seminars and other promotional activities and

via private email and/or WeChat solicitations following said promotional activities.

95. Upon information and belief, Plaintiffs justifiably relied on Defendants' later misrepresentations and false and misleading communications, which were repeatedly made after Plaintiffs had provided their investments between 2021 and early 2026; the purpose of these communications was to further conceal and delay discovery of the Scheme and lull Plaintiffs into continued inaction.

96. In reasonable reliance on these misleading representations and omissions, Plaintiffs were induced to maintain their respective investments and lulled into refraining from taking investigative and/or protective action, in the engineered belief that their investment capital remained secure and that the Project was progressing unabated toward success, thereby complying with and ultimately fulfilling the requirements of the EB-5 Program.

97. Plaintiffs could not reasonably discover the facts constituting the Scheme—including scienter—until the combination of the October 2023 partial disclosure, the 2025 USCIS/UCC/foreclosure events, the January 2026 "project completed" letter, or the February 2026 deed-in-lieu transfer revealed the true facts and nature of the Scheme.

98. As a direct and proximate result of Defendants' Scheme, misrepresentations, and concealments, the Project's assets have been foreclosed upon or otherwise disposed of, and Plaintiffs' investments – together with the investments of their fellow EB-5 investors, totaling over $94.9 million, have been lost or are at imminent risk of being completely wiped out.

99. In addition, due to the termination of Defendant HIRC as the sponsoring regional center for the Project, Plaintiffs' immigration status has been placed in immediate jeopardy, stymying the very purpose of their investment thereby causing severe personal and financial hardship.

//

//

COMPLAINT

**FIRST CLAIM FOR RELIEF**
**Declaratory Relief – Alter Ego Liability**
**(As Against All Defendants except Barrack and LCP)**

100. Plaintiffs reaffirm, reallege, and incorporate by reference paragraphs 1 through 99 above as if fully set forth herein.

101. Defendant King is, and at all relevant times was, the only member, manager, or person in control of entity Defendants Dream Lender LP, Selma LP, 6417 Hotel LLC, 6417 GP, HIRC Selma, 6417 Holdings, 6421 Restaurant, 1601 Nightclub, HIRC, and RG.  Defendant Chen exercised authority and control over King, and, through King, over Defendants Dream Lender LP, Selma LP, 6417 Hotel LLC, 6417 GP, HIRC Selma, 6417 Holdings, 6421 Restaurant, 1601 Nightclub, HIRC, and RG.  Defendant Chen installed Defendant Jason to act as the nominee registered agent and point of contact for Defendants Dream Lender LP, 6417 Hotel LLC, 6417 GP, HIRC Selma, 6417 Holdings, 6421 Restaurant, 1601 Nightclub, HIRC, and RG.  Dream Lender LP, Selma LP, 6417 Hotel LLC, 6417 GP, HIRC Selma, 6417 Holdings, 6421 Restaurant, 1601 Nightclub, HIRC, and RG (the "Alter Ego Entities") were operated with such unity of interest and ownership with Chen and King that their separate personalities ceased to exist, and that respecting separateness would sanction the alleged diversion and loss of Plaintiffs' investment interest.

102. Plaintiff contends that each of the Alter Ego Entities is an alter ego of Defendants Chen and King.  Plaintiff contends that, at all relevant times:

    a. Chen and King controlled the business and affairs of the Alter Ego Entities, holding themselves out as the managers/actual controllers of each of the Alter Ego Entities, signing agreements on their behalf, and operating the Project's corporate structure with no meaningful separation;

    b. There was such a unity of interests between Chen, King, and the Alter Ego Entities that the separate personalities of the Alter Ego Defendants no longer existed;

COMPLAINT

c. Chen, directly and through King and Jason, completely dominated, controlled, and otherwise governed the Alter Ego Entities. Chen and King, directly and through the ownership and management chain alleged above, dominated material financing, operational, and investor-communication decisions of the Alter Ego Entities;

d. The Alter Ego Entities, under the complete domination and control of Chen, King, and Jason, were actors in the wrongful and unlawful course of conduct constituting abuse of the corporate privilege for which alter ego liability is justified, including, but not limited to:

   i. The funds and assets of the Alter Ego Entities were commingled, depleted, and diverted without regard to proper entity separateness for the benefit of Chen, King, or their controlled affiliates ;

   ii. Legal formalities of the Alter Ego Entities were disregarded: HIRC was used as the payroll entity for the Related Project; even though USCIS terminated HIRC in September 2025, HIRC continued to send "regional center" style investor communications (auction notices, restructuring letters, "project completion" letter) afterward; and arm's length relationships were not maintained between Chen, King, Jason, and the Alter Ego Entities;

   iii. The Alter Ego Entities concertedly concealed and/or misrepresented the identity of the responsible ownership, financial interest, and personal business activities of the Alter Ego Entities as well as Chen, King, and Jason's actual participation and roles in their operation;

   iv. The Alter Ego Entities have overlapping officers, addresses, directors, and/or managers, each of whom was either Chen, King, or Jason;

   v. The Alter Ego Entities were inadequately capitalized: USCIS

31

COMPLAINT

terminated its sponsorship of Defendant HIRC due to non-payment; despite representing that the Project was capitalized with at least $94.9 million in investor funds and roughly $52 million in sponsor equity/funds, Chen and King encumbered the Project with the Fraudulent Loan, a $33 million high-risk senior loan, which was promptly defaulted on and Article 9 foreclosure proceedings initiated which left the Alter Ego Entities unable to satisfy their obligations to Plaintiffs pursuant to the Subscriptions, the partnership agreements, and the PPMs; and

vi. Chen, King, and Jason have used the Alter Ego Entities to shield King and Chen from personal responsibility for obligations owed to Plaintiffs by structuring Plaintiffs' interests several layers removed from the owners of the Hotel and Restaurant and thereby from the Loan and Equity Collateral, loading the Alter Ego Entities and the Project generally with the Fraudulent Loan, allowing the Hotel and Restaurant properties to be foreclosed or sold at auction in satisfaction of the Fraudulent Loan, and then treating the resulting investor losses as confined to the corporate shells while King and Chen retained control of other assets and business ventures.

103. An actual controversy exists because Chen, King, and the Alter Ego Entities dispute that the entities may be treated as alter egos for purposes of the substantive liabilities alleged in this Complaint, while Plaintiffs contend that the unity-of-interest and inequitable-result allegations permit the Court to disregard separateness.

104. Plaintiffs contend that (i) an inequitable and unjust result would follow if the corporate separateness of the Alter Ego Entities and Chen, King, and Jason were respected as against Plaintiffs, (ii) no adequate alternative remedy exists, and (iii) a declaration of the liability of the Alter Ego Entities, as the alter egos of Chen, King,

COMPLAINT

and Jason, is necessary to avoid sanctioning a fraud and promoting injustice.

105. Accordingly, Plaintiffs seek a declaratory judgment finding the Alter Ego Entities to be the alter egos of Chen, King, and Jason for purposes of the substantive obligations and liabilities established in this action.

## SECOND CLAIM FOR RELIEF

**Securities Fraud – Violation of Section 10(b) of the Exchange Act**
**(As Against Defendants Chen, King, Barrack, HIRC, RG, Dream Lender LP, Selma LP, HIRC Selma, 6417 GP, and 6417 Hotel LLC)**

106. Plaintiffs reaffirm, reallege, and incorporate by reference paragraphs 1 through 105 above as if fully set forth herein.

107. Defendants Chen, King, Barrack, HIRC, RG, Dream Lender LP, Selma LP, HIRC Selma, 6417 GP, and 6417 Hotel LLC (together, the "Soliciting Defendants") made materially false misleading representations and omissions to Plaintiffs in the offering materials for the Project, through, *inter alia*, the PPM, the Subscriptions, the partnership agreements, promotional pamphlets and brochures for the Project, Wechat messages, and emails, transmitted while the Soliciting Defendants were located in the United States and Plaintiffs were located in the PRC.

108. The Soliciting Defendants made materially false misleading representations and omissions to Plaintiffs following their investments in the Project, through, *inter alia*, the Progress Reports, and the letters sent to Plaintiffs between 2021 and 2025 that purportedly modified Plaintiffs' investments.

109. The misrepresentations and omissions included, but were not limited to: (a) that the Project was approved by the USCIS as an accredited EB5 Program; (b) that the number of solicited and participating investors in the Project; (c) that the corporate structure surrounding the Project involved separate, distinct, and independent entities; (d) that the Project was a separate, distinct, and independent EB5 Program from the Related Project; (e) that the managers of the Project had extensive experience and success in commercial/hospitality real estate development in the TEA; (f) that the Project involved the participation and prestige of Colony NorthStar; (g) that Chen was

only involved with the Project as an immigration agent through VCG; (h) that Plaintiffs' investment capital would be used solely for the development and operation of the Project; (i) that the Fraudulent Loan was acquired for and would be used to "repay other loans"; (j) the Project had defaulted on a $33.3 million senior loan it secured in 2023; (k) that the Project had already been declared in default of the Fraudulent Loan; (l) that a foreclosure auction had already been scheduled as a result of that default; (m) that the foreclosure auction was postponed and that "asset restructuring" negotiations were underway; (n) that the "deed-in-lieu" amendment effectively made investor recovery impossible and also eliminated the investors' right to sue LCP; and (o) that as of January 9, 2026, the "project was completed."

110. In reality, contrary to Soliciting Defendants' misrepresentations and omissions, Soliciting Defendants knowingly concealed the presence of several conflicts of interest within the corporate structure for the Project, Chen's deep involvement in and control over the corporate structure and the Project itself, structural co-mingling between the Related Project and the Project including using funds raised for the Project on the Related Project, King and the other disclosed managers of the Project did not have any meaningful experience with commercial/hospitality real estate development, the Project was not an approved/accredited EB5 Program, Colony NorthStar was not involved with the Project, instead Barrack only contributed Space Global's PRC based infrastructure to the Project and used Colony NorthStar's event space in California to host investors, the existence and material terms of the Fraudulent Loan issued by Defendant LCP, HIRC's termination by USCIS, the Project's financial issues including its inability to repay the Fraudulent Loan, and the subsequent UCC notice, foreclosure, and sale of the Loan and Equity Collateral as a result.

111. By reason of the foregoing, Soliciting Defendants, and each of them, directly and indirectly, through the use of the means and instrumentalities of interstate commerce, employed devices, schemes, and artifices to defraud Plaintiffs and thereby solicit Plaintiffs' investment capital, in violation of Section 10(b) of the Exchange Act,

15 U.S.C. § 78j(b) and Rules 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

112. As is alleged above, unbeknownst to Plaintiffs, the Soliciting Defendants, through the use of the PPMs, Subscriptions, partnership agreements, marketing materials, and in particular the periodic Progress Reports and investor updates issued from 2017 through at least January 2026, repeatedly and purposefully misrepresented that the Project was performing well, generating revenues above industry averages, and was on a sound financial footing, and they touted the Project's reputation as a successful Los Angeles landmark, including that luxury brands used the Tao Restaurant as a backdrop in advertising campaigns, thereby creating the impression of sustained commercial success and investment safety.

113. These same communications failed to disclose, purposefully omitted, and thereby concealed, material adverse facts, including but not limited to: (a) the Fraudulent Loan, its senior-secured nature, and first-priority lien on the Project's primary assets, the Hotel and the Restaurant real properties; (b) the Project's inability to properly service the Fraudulent Loan and the existence or imminence of default under the loan agreement; (c) the August 8, 2025, DAILYDAC Public Notice of UCC Article 9 Sale and the scheduled October 17, 2025, private auction prompted by the Project's failure to repay the Fraudulent Loan; and (d) the serious risk that foreclosure and/or a UCC Article 9 sale would wipe out or severely impair Plaintiffs' Loan and Equity Collateral.

114. Unbeknownst to Plaintiffs, after USCIS terminated Defendant HIRC as an approved regional center on or about January 30, 2025, which Plaintiffs did not know about especially due to Soliciting Defendants' concealment efforts as set forth herein, Soliciting Defendants, including HIRC and individuals acting on its behalf, continued to send false and misleading letters to investors in October, November, and December 2025, and January 2026, describing various supposed "foreclosure auctions," postponements, negotiations with new investors, and purported "asset restructuring," and ultimately claiming on January 9, 2026 that the Project was "completed," without

35

COMPLAINT

disclosing the true status of the Fraudulent Loan, any UCC Article 9 sale or foreclosure, the disposition of the collateral, or the impact of those events on Plaintiffs' interests and immigration objectives.

115. These statements and omissions were materially false and misleading because they created the impression that the Project was and remained viable and functioning.

116. In addition to those specific material misrepresentations and omissions, Soliciting Defendants employed devices, schemes, and artifices to defraud, and engaged in acts, practices, and courses of business which operated as a fraud and deceit upon Plaintiffs, in violation of Rule 10b-5(a) and (c), by, *inter alia*, Soliciting Defendants willfully and purposefully misusing Plaintiffs' investment capital by (a) encumbering the Project with the Fraudulent Loan on terms which subordinated Plaintiffs' interests behind those of LCP; (b) concealing the resulting priority structure while preserving the appearance that Plaintiffs' investment interest remained protected; (c) negotiating or implementing the forbearance, releases, deed-in-lieu, and collateral transfers that extinguished Plaintiffs' interests while conferring the benefits to themselves; (d) allowing the Project's primary assets to be subjected to a private UCC Article 9 foreclosure sale process; (e) comingling and using Plaintiffs' investment capital on the Related Project; (f) simultaneously continuing to disseminate reassuring and selectively positive communications to Plaintiffs while concealing materials facts, events, and risks in order to lull Plaintiffs' into continued inactivity.

117. Soliciting Defendants acted with scienter in that they knew, or were deliberately reckless in not knowing, at the time they made the foregoing statements and omissions, that the Project had taken on the crippling Fraudulent Loan secured by a first-priority lien, that the Project was in default or imminent default under that loan, that a UCC Article 9 sale had been scheduled and/or conducted, and that USCIS had terminated HIRC, yet they concealed or mischaracterized these facts while continuing to solicit, retain, and control Plaintiffs' investment capital and to induce Plaintiffs to maintain their EB-5 investments. Moreover, Soliciting Defendants acted with scienter

36

COMPLAINT

in that they knew, or were deliberately reckless in not knowing, at the time they solicited the investment capital from Plaintiffs, that the capital was going to be misused so as to personally benefit and enrich Chen and King personally.

118. Plaintiffs reasonably and/or justifiably relied on Soliciting Defendants' misstatements and omissions including use of their investment capital.  Plaintiffs relied upon the PPM, the Subscriptions, the partnership agreements, promotional pamphlets and brochures for the Project, Wechat messages, and emails and other offering/promotional materials in deciding to purchase the limited partnership interests, and they reasonably relied on the continuing positive updates, reassurances, and statements about purported auctions, negotiations with new investors,, "asset restructuring," and "completion" of the Project in deciding to maintain their investments, refrain from initiating investigative, legal, or other protective actions, and continue to pursue the promised EB5 Program benefits through the Project.

119. If the Soliciting Defendants had not omitted, concealed, or misrepresented such material information and instead truthfully disclosed the truth about the Project's corporate structure, the Fraudulent Loan, the conflicts of interest, the comingling of the Project's funds and assets with those of the Related Project, the unapproved/unaccredited nature of the Project, and the other egregious material misrepresentations described at length above, Plaintiffs would not have invested their capital and purchased the partnership interests, or would have acted accordingly to protect their investments, challenge the Fraudulent Loan and foreclosure, or otherwise pursued other immigration and investment opportunities.

120. As a direct and proximate result of Soliciting Defendants violations of Section 10(b) of the Exchange Act and Rule 10b-5, Plaintiffs have suffered damages, including but not limited to the loss of their investment capital, loss of expected returns on their investment capital, and other consequential damages, in an amount exceeding $24,705,000 and to be proven at trial.

//

COMPLAINT

**THIRD CLAIM FOR RELIEF**
**Control Person Liability – Section 20(a) of the Exchange Act**
**(As Against Chen and King)**

121. Plaintiffs reaffirm, reallege, and incorporate by reference paragraphs 1 through 120 above as if fully set forth herein.

122. At all relevant times, Defendants Chen and King exercised actual power and control, directly or indirectly, over Defendants HIRC, RG, Dream Lender LP, Selma LP, HIRC Selma, 6417 GP, and 6417 Hotel LLC and the remaining Project entities (the "Controlled Entities"), including their management, policies, and day-to-day operations, and over the content, timing, and dissemination of the PPM, Subscriptions, partnership agreements, Progress Reports, investor letters, and other communications described above.

123. By reason of their control, Defendants Chen and King had full dominion and the full ability to, and did, influence and direct the decision-making of the Controlled Entities, including decisions to encumber the Project with the Fraudulent Loan, to purposefully and knowingly withhold or mischaracterize material information about the true nature of the Project, the corporate structure for the Project, the inter-connected nature of the Related Project and the Project, the Project's management structure, the Project's financial health, the Fraudulent Loan and subsequent foreclosure, and to continue disseminating reassuring communications to Plaintiffs notwithstanding USCIS's termination of its sponsorship of Defendant HIRC and the financial ruination of the Project.

124. Defendants Chen and King acted in bad faith and directly and indirectly induced the primary violations by authorizing, approving, or recklessly failing to prevent the dissemination of false and misleading statements and omissions to Plaintiffs to induce their investments and by directing or approving the intermingling of investment capital between the Related Project and the Project, and the Fraudulent

Loan and related foreclosure strategies that directly harmed Plaintiffs by wiping out their Loan and Equity Collateral and rendering their investments useless.

125. As a direct and proximate result of Defendant Chen and King's control-person violations, Plaintiffs have suffered damages, including but not limited to the loss of their investment capital, loss of expected returns on their investment capital, and other consequential damages, in an amount exceeding $24,705,000 and to be proven at trial.

## FOURTH CLAIM FOR RELIEF

**Securities Fraud – Violation of California Corporations Code Section 25401**
**(As Against Defendants Chen, King, Barrack, HIRC, RG, Dream Lender LP, Selma LP, HIRC Selma, 6417 GP, and 6417 Hotel LLC)**

126. Plaintiffs reaffirm, reallege, and incorporate by reference paragraphs 1 through 125 above as if fully set forth herein.

127. Defendants Chen, King, Barrack, HIRC, RG, Dream Lender LP, Selma LP, HIRC Selma, 6417 GP, and 6417 Hotel LLC (the "Soliciting Defendants") are "persons" within the meaning of § 25401 and, at all relevant times, offered and sold the limited partnership securities in this state, within the meaning of California Corporations Code § 25008, by means of written and oral communications directed to Plaintiffs. The offers and sales originated from, and were made through, California-based/registered entities associated with the Project, which is located in the Hollywood area of Los Angeles, California.

128. The written and oral communications by which the Soliciting Defendants in this state offered, marketed, and sold, or caused to be offered, marketed, and sold, the limited partnership securities included, without limitation: PPMs, Subscriptions, partnership agreements, marketing presentations, brochures, pamphlets, and seminars, and the ongoing Progress Reports for the Project and investor updates disseminated directly to Plaintiffs from 2017 through at least January 2026 in English and Chinese.

129. These communications contained untrue statements of material fact and omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading. Specifically, as alleged

39

COMPLAINT

above, the communications: (a) misrepresented that the Project was approved by the USCIS as an accredited EB5 Program; (b) misrepresented the number of solicited and participating investors in the Project; (c) misrepresented that the corporate structure surrounding the Project involved separate, distinct, and independent entities; (d) misrepresented that the Project was a separate, distinct, and independent EB5 Program from the Related Project; (e) misrepresented that the managers of the Project had extensive experience and success in commercial/hospitality real estate development in the TEA; (f) misrepresented that the Project involved the participation and prestige of Colony NorthStar; (g) misrepresented Chen's true involvement with the Project; (h) misrepresented that Plaintiffs' investment capital would be used solely for the development and operation of the Project; (i) repeatedly described the Project as financially successful; (j) failed to disclose the existence, nature, and priority of the Fraudulent Loan; (k) failed to disclose defaults and the August 8, 2025 UCC Article 9 sale notice and October 17, 2025 private auction; (l) failed to disclose the sponsorship termination of Defendant HIRC by USCIS; and (m) described purported foreclosure auctions, postponements, negotiations with new investors, and "completion" of the Project without candidly disclosing the status and consequences of any foreclosure or transfer.

130. These misstatements and omissions were material because a reasonable EB-5 immigrant investor would consider the Project's accurate and true capitalization, indebtedness, lien structure, corporate structure, foreclosure risks, and USCIS regional center sponsorship and accreditation of the Project as critically important when deciding whether or not to invest and participate in a given EB5 Program offering as well as whether or not to continue to hold or seek to exit the Project and the limited partnership securities invested in.

131. Plaintiffs invested in the Project by means of these communications, in that Plaintiffs reasonably relied on the PPMs, Subscriptions, partnership agreements, marketing presentations, brochures, pamphlets, and seminars, and the ongoing

COMPLAINT

Progress Reports for the Project and investor updates in deciding to invest and in refraining from rescinding, redeeming, or otherwise protecting their positions despite warning signs.

132. As a direct and proximate result of the Soliciting Defendants' violations of § 25401, Plaintiffs have suffered damages in an amount to be proven at trial, but in any event no less than $24,705,000 and are entitled to all remedies provided by § 25501.

## FIFTH CLAIM FOR RELIEF
### Fraud (Intentional Misrepresentation, Concealment, and False Pretenses)
### (As Against All Defendants)

133. Plaintiffs reaffirm, reallege, and incorporate by reference paragraphs 1 through 132 above as if fully set forth herein.

134. Defendants made numerous affirmative misrepresentations of material facts to the Plaintiffs and concealed and failed to disclose material facts that Defendants had a duty to disclose, both before and after Plaintiffs provided their investment capital. Specifically, as alleged above, these communications include but are not limited to: (a) misrepresented that the Project was approved by the USCIS as an accredited EB5 Program; (b) misrepresented the number of solicited and participating investors in the Project; (c) misrepresented that the corporate structure surrounding the Project involved separate, distinct, and independent entities; (d) misrepresented that the Project was a separate, distinct, and independent EB5 Program from the Related Project; (e) misrepresented that the managers of the Project had extensive experience and success in commercial/hospitality real estate development in the TEA; (f) misrepresented that the Project involved the participation and prestige of Colony NorthStar; (g) misrepresented Chen's true involvement with the Project; (h) misrepresented that Plaintiffs' investment capital would be used solely for the development and operation of the Project; (i) repeatedly described the Project as financially successful; (j) extended the Plaintiffs' right to repayment by one year in 2021 without disclosing financial health of Project; (k) failed to disclose the existence, nature, and priority of

the Fraudulent Loan; (l) failed to disclose defaults and the August 8, 2025 UCC Article 9 sale notice scheduling of foreclosure auction; (m) failed to obtain Plaintiffs' consent to further extend the Plaintiffs' right to repayment in 2023 until 2028; (n) failed to disclose the true nature of the subordination by the Fraudulent Loan which effectively rendered Plaintiffs' ability to recover on their investments all but impossible; (o) failed to disclose the sponsorship termination of Defendant HIRC by USCIS; (p) repeated progress reports from 2017 through April 2025 stating that the Project was performing well, with revenues exceeding industry averages; (q) the April 21, 2025 update stating that the Project remained "optimistic about future operations" despite only a temporary revenue decline; (r) letters in late 2025 claiming that foreclosure auctions were being scheduled and postponed, and that negotiations with new investors and asset restructurings were underway; (s) failed to disclose the effect of the "deed-in-lieu" amendment on Plaintiffs' interests in Selma LP and Dream Lender LP; (t) failed to disclose the effect of the "deed-in-lieu" amendment on Plaintiff's ability to recover their investments; (u) failed to disclose the "deed-in-lieu" amendment's provisions eliminating Plaintiffs' right to seek redress against LCP; and (v) the January 9, 2026 letter stating that the "project was completed."

135. Defendants had exclusive or superior knowledge of the Project's USCIS accreditation, the Project's corporate structure, the conflicts of interest inherent to both the corporate and the management structure for the Project, the experience of the Project's managers, the Fraudulent Loan, the Project's defaults or imminent defaults under that loan, the UCC Article 9 sale and foreclosure status, and the USCIS termination of HIRC. They actively concealed these facts from Plaintiffs and, having chosen to speak extensively about the Project's operations, finances, immigration prospects, and supposed foreclosure processes, they were obligated to speak fully and honestly so as not to mislead prospective and current investors, rather than providing partial, one-sided disclosures that omitted the most adverse and material information and induced investments and then subsequently lulled investors into inaction until it

COMPLAINT

was too late.

136. Defendants knew, or were deliberately reckless in not knowing, that their affirmative statements and omissions were false or misleading and that those affirmative statements and omissions were material to a reasonable EB-5 immigrant investor.

137. Plaintiffs justifiably relied upon the Defendants' misrepresentations and concealments in both making and maintaining their investments into the Project, in continuing to believe that the Project was financially and operationally viable, and that their immigration goals would be achieved due to the success of the Project, and in refraining from seeking rescission, initiating litigation, or pursuing alternative immigration pathways.

138. As a direct and proximate result of Defendants' fraud and fraudulent concealment, Plaintiffs have suffered damages, including but not limited to the loss of their invested capital, loss of expected immigration benefits, and additional consequential damages, in an amount exceeding $24,705,000 and to be proven at trial.

<u>**SIXTH CLAIM FOR RELIEF**</u>
**Negligent Misrepresentation**
**(As Against All Defendants)**

139. Plaintiffs reaffirm, reallege, and incorporate by reference paragraphs 1 through 138 above as if fully set forth herein.

140. Defendants made numerous affirmative misrepresentations of past or existing material facts to the Plaintiffs, both before and after Plaintiffs provided their investment capital. Specifically, as alleged above, these communications include but are not limited to: (a) misrepresented that the Project was approved by the USCIS as an accredited EB5 Program; (b) misrepresented the number of solicited and participating investors in the Project; (c) misrepresented that the corporate structure surrounding the Project involved separate, distinct, and independent entities; (d) misrepresented that the Project was a separate, distinct, and independent EB5 Program from the Related

43

COMPLAINT

Project; (e) misrepresented that the managers of the Project had extensive experience and success in commercial/hospitality real estate development in the TEA; (f) misrepresented that the Project involved the participation and prestige of Colony NorthStar; (g) misrepresented Chen's true involvement with the Project; (h) misrepresented that Plaintiffs' investment capital would be used solely for the development and operation of the Project; (i) repeatedly described the Project as financially successful; (j) failed to disclose the existence, nature, and priority of the Fraudulent Loan; (k) failed to disclose defaults and the August 8, 2025 UCC Article 9 sale notice and October 17, 2025 private auction; (l) failed to disclose the sponsorship termination of Defendant HIRC by USCIS; (m) repeated progress reports from 2017 through April 2025 stating that the Project was performing well, with revenues exceeding industry averages; (n) the April 21, 2025 update stating that the Project remained "optimistic about future operations" despite only a temporary revenue decline; (o) letters in late 2025 claiming that foreclosure auctions were being scheduled and postponed, and that negotiations with new investors and asset restructurings were underway; and (p) the January 9, 2026 letter stating that the "project was completed."

141. The Defendants lacked reasonable grounds to subjectively believe that those misrepresentations were true at the time they were made to Plaintiffs in light of their access to and knowledge of the actual truth, which directly contradicted the misrepresentations.

142. Defendants intended, or should reasonably have expected, that Plaintiffs would rely on these misrepresentations in making and maintaining their investments into the Project and in refraining from taking any protective measures, including seeking rescission, initiating litigation, or withdrawing their capital and participation in the Project.

143. Plaintiffs justifiably relied upon these misrepresentations and suffered damages as a direct and proximate result of their justifiable reliance, including the loss of their investments and the related harms to their immigration prospects.

44

COMPLAINT

144. As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiffs have suffered damages, including but not limited to the loss of their invested capital, loss of expected immigration benefits, and additional consequential damages, in an amount exceeding $24,705,000 and to be proven at trial.

145. This cause of action is pled in the alternative to Plaintiffs' Fifth Claim for Relief for Fraud.

### SEVENTH CLAIM FOR RELIEF
### Breach of Fiduciary Duties and Constructive Fraud
**(As Against Defendants Chen, King, Barrack, HIRC, RG, Dream Lender LP, Selma LP, HIRC Selma, 6417 GP, and 6417 Hotel LLC)**

146. Plaintiffs reaffirm, reallege, and incorporate by reference paragraphs 1 through 145 above as if fully set forth herein.

147. Defendants Chen, King, Barrack, HIRC, RG, Dream Lender LP, Selma LP, HIRC Selma, 6417 GP, and 6417 Hotel LLC stood in fiduciary or at least confidential relationships with Plaintiffs by virtue of, among other things: (a) their roles as managers, owners, and controlling persons of the entities that received and controlled Plaintiffs' investment capital; (b) their status as an EB-5 Program regional center and Project sponsors responsible for safeguarding Plaintiffs' capital and immigration objectives; (c) their representations that prospective investors could trust and rely on their expertise in evaluating, managing, and reporting on the investment and the Project; (d) their structuring, control, and management of the purposefully layered ownership and financing chain through which Plaintiffs' investment capital flowed through and into entities that were ultimately controlled by themselves, thereby subordinate, Plaintiffs' interests in the Project; (e) Plaintiffs' status as limited partners of Defendants Selma LP and Dream Lender LP; (f) their ownership and possession of the Loan and Equity Collateral securing the Selma Investment from Defendant Selma LP, and the LP Loan from Defendant Dream Lender LP, to 6417 Hotel LLC, both comprised of Plaintiffs' investment capital.

148. Defendants Chen, King, Barrack, HIRC, RG, Dream Lender LP, Selma LP,

HIRC Selma, 6417 GP, and 6417 Hotel LLC breached their fiduciary duties by: (a) failing to fully disclose and affirmatively concealing the extent of the inherent conflicts of interest within the Project's corporate structure; (b) encumbering the Loan and Equity Collateral with the Fraudulent Loan without the full and informed disclosure to, or consent of, Plaintiffs; (c) failing to disclose, or actively concealing, the Fraudulent Loan's terms and mezzanine collateral structure that placed the Fraudulent Loan in first priority, the Project's defaults or imminent defaults thereunder, the DAILYDAC "Public Notice of UCC Article 9 Sale," the scheduling of an October 17, 2025 private UCC Article 9 auction by Defendant LCP; (d) failing to disclose the USCIS' termination of its sponsorship of Defendant HIRC's and the direct negative implications for Plaintiffs' immigration petitions and of Defendant HIRC's ability to protect Plaintiffs' interests in connection with the Fraudulent Loan, the Loan and Equity Collateral, or UCC sale; (e) issuing the Progress Reports and letters that omitted, downplayed, or affirmatively mischaracterized these material developments while emphasizing positive and largely falsified information about the Project's operations; (f) failing to take reasonable steps, or any meaningful steps, to protect Plaintiffs' investment capital and related interests in the Loan and Equity Collateral in connection with any foreclosure proceeding; (g) failing, despite their superior access and control, to provide or make available to Plaintiffs the organizational, loan, collateral, and sale documents for Defendant LCP; and (h) repeatedly engaged in self-dealing through the use of the Project's corporate structure which funneled control and benefits directly to Defendants Chen and King and thereby further concealing the capital-structure risks inherent to the Project's corporate structure.

149. Defendants Chen, King, Barrack, HIRC, RG, Dream Lender LP, Selma LP, HIRC Selma, 6417 GP, and 6417 Hotel LLC's sustained failures to candidly disclose material facts, coupled with their continued reassuring communications to Plaintiffs, constitutes constructive fraud. This constructive fraud is further evidenced by their use of a purposefully layered mezzanine and holding-company structure that was operated

46

COMPLAINT

to funnel all control and benefits of the Project to Defendants Chen and King in addition to giving them the ability to strip Plaintiffs of their interests in the Loan and Equity Collateral and thereby rendering their investments functionally worthless.

150. Plaintiffs reasonably relied on Defendants Chen, King, Barrack, HIRC, RG, Dream Lender LP, Selma LP, HIRC Selma, 6417 GP, and 6417 Hotel LLC's fiduciary positions and on the communications that were disseminated to Plaintiffs and consequently Plaintiffs continued to entrust their investment capital and immigration objectives with Defendants Chen, King, Barrack, HIRC, RG, Dream Lender LP, Selma LP, HIRC Selma, 6417 GP, and 6417 Hotel LLC's management, thereby suffering the losses alleged above.

151. As a direct and proximate result of these breaches of fiduciary duties and constructive fraud, Plaintiffs have suffered damages exceeding $24,705,000 and in an amount to be proven at trial.

## EIGHTH CLAIM FOR RELIEF
### Breach of Contract
### (As Against Defendants Chen, King, Dream Lender LP, Selma LP, HIRC Selma, and 6417 GP)

152. Plaintiffs reaffirm, reallege, and incorporate by reference paragraphs 1 through 151 above as if fully set forth herein.

153. Plaintiffs, as admitted limited partners in Defendants Selma LP and Dream Lender LP, entered into a written contract with Defendants Chen, King, Dream Lender LP, Selma LP, HIRC Selma, and 6417 GP upon signing the counterpart signature page of the respective partnership agreements that was included as Exhibit A to those partnership agreements themselves.

154. The partnership agreements are valid and binding written contracts supported by valuable consideration – Plaintiffs agreed to and did provide $500,000 to acquire a limited partnership unit in Defendants Selma LP and Dream Lender LP, and in turn, Defendants Chen, King, Dream Lender LP, Selma LP, HIRC Selma, and 6417 GP agreed to provide Plaintiffs with limited partner interests and admit Plaintiffs as limited

47

COMPLAINT

partners in Defendants Selma LP or Dream Lender LP, use Plaintiff's investment capital to provide the Selma Investment and the LP Loan to Defendant 6417 Hotel LLC which would be secured by the Loan and Equity Collateral, facilitate Plaintiffs' immigration petitions through operation of the Project, and protect Plaintiffs' interests in the Loan and Equity Collateral.

155. Selma LP Plaintiffs executed the Subscription and partnership agreement for Defendant Selma LP between August 2, 2013, and July 23, 2015. Selma LP Plaintiffs provided their investment capital between September 12, 2013, and July 28, 2015. Selma LP Plaintiffs were subsequently admitted as limited partners on or about the same day that they provided their investment capital.

156. Dream Lender LP Plaintiffs executed the Subscription and partnership agreement for Defendant Dream Lender LP between October 21, 2016, and July 31, 2017. Dream Lender LP Plaintiffs provided their investment capital between August 17, 2017 and November 10, 2017. Dream Lender LP Plaintiffs were subsequently admitted as limited partners on or about the same day that they provided their investment capital.

157. Defendants Chen, King, Dream Lender LP, Selma LP, HIRC Selma, and 6417 GP breached the respective partnership agreements on March 20, 2023, with the execution of the Fraudulent Loan and the subsequent encumbrance of the Loan and Equity Collateral and subordination of Plaintiffs' secured interest in the Loan and Equity Collateral to the Fraudulent Loan.

158. Defendants Chen, King, Dream Lender LP, Selma LP, HIRC Selma, and 6417 GP breached the respective partnership agreements again in October 2025 by defaulting on the Fraudulent Loan thereby causing Defendant LCP to commence UCC Article 9 foreclosure proceedings against the Loan and Equity Collateral and in February 2026 by allowing Defendant LCP to effectuate the foreclosure, acquire the Loan and Equity Collateral, and wipe out Plaintiffs' interests in the Loan and Equity Collateral.

159. Finally, Defendants Chen, King, Dream Lender LP, Selma LP, HIRC Selma, and 6417 GP breached the respective partnership agreements by allowing Defendant HIRC to default on its obligation to USCIS thereby causing USCIS to terminate its sponsorship of Defendant HIRC on or about January 30, 2025 as an EB5 Program regional center, which termination directly placed Plaintiffs' immigration petitions in jeopardy and immediate risk of denial.

160. As a direct result of Defendants Chen, King, Dream Lender LP, Selma LP, HIRC Selma, and 6417 GP's breaches of the respective partnership agreements, Plaintiffs have been damaged in an amount to be determined at trial but in no event less than $24,705,000.

### <u>NINTH CLAIM FOR RELIEF</u>
### Violation of 18 U.S.C. § 1962(c) – Civil RICO
### (As Against all Defendants)

161. Plaintiffs reaffirm, reallege, and incorporate by reference paragraphs 1 through 160 above as if fully set forth herein.

162. This claim is brought pursuant to the civil remedy provision of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964(c) which explicitly authorizes a private civil action to be brought by any person injured in his business or property by reason of a violation of 18 U.S.C. § 1962 and permits recovery of treble damages, costs, and reasonable attorney's fees.

163. Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3).

164. At all times relevant, an "enterprise" existed within the meaning of 18 U.S.C. § 1961(4), including a group of individuals and entities associated in fact and/or one or more legal entities. Specifically, the "enterprise" consisted of all Defendants and the other persons or entities that knowingly joined the common purpose of obtaining and retaining control over Plaintiffs' capital and collateral through the concealed the Project, Scheme, restructuring and enforcement sequence. The enterprise had relationships among its participants, including the ownership and management chain alleged above;

COMPLAINT

a common purpose extending beyond any single communication; and sufficient longevity to pursue that purpose from at least 2023 through the present.

165. The "enterprise" was engaged in, or its activities affected, interstate and/or foreign commerce.

166. The "enterprise" was distinct from each Defendant "person" who violated 18 U.S.C. § 1962(c) because the "enterprise" consists of more than one member, each of which had a common purpose to engage in and support the Scheme to defraud Plaintiffs – the improper purpose of the "enterprise".

167. Defendants conducted or participated, directly or indirectly, in the conduct of the "enterprise's" affairs, as is extensively alleged above. Among others, Defendants conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through the coordinated course of conduct alleged above, including the control and management of Plaintiffs' investment entities, the incurrence and enforcement of the Fraudulent Loan, the concealment or mischaracterization of material developments, the restructuring and forbearance process, and the ultimate transfer of the Project property and elimination of the Loan and Equity Collateral.

168. Defendants' conduct included managing or operating the "enterprise's" affairs, as is extensively alleged above.

169. Defendants conducted the "enterprise's" affairs through a "pattern of racketeering activity" as that phrase is used within RICO.  A "pattern of racketeering activity:" requires at least two acts of racketeering activity within a ten-year period.

170. Specifically, Defendants' "racketeering activity" includes Defendants' mail/wire fraud, specifically Defendants' fraudulent and misleading ongoing communications to Plaintiffs that were specifically intended to conceal and delay the discovery of the Scheme and lull Plaintiffs into inaction, which were made between 2023 and 2026 within the meaning of 18 U.S.C. § 1961(1)(B).  Defendants intentionally participated in the Scheme to defraud Plaintiffs of money and used the mails and/or interstate wires in furtherance of the Scheme.

50

COMPLAINT

171. Specifically, Defendants' "pattern of racketeering activity" includes the acts of "racketeering" alleged above, which were conducted between 2023 and 2026, are related to and an integral element of the overall Scheme to defraud Plaintiffs of their investment capital, and comprise a closed-ended pattern of racketeering conduct which severely injured Plaintiffs' by the foreclosure on the Loan and Equity Collateral being consummated and Plaintiffs' interests in the Loan and Equity Collateral and thereby their investments into the Project, wiped out in addition to the termination of Defendant HIRC by USCIS which termination has severely jeopardized Plaintiffs' immigration petitions, the success of which was the primary purpose behind Plaintiffs' initial decisions to invest in the Project.

172. The circumstances of the fraudulent Scheme are alleged with specificity at great length above, including the circumstances of the fraud and how the communications disseminated to Plaintiffs were fraudulent on their face, consistent with Federal Rule of Civil Procedure 9(b)'s specificity requirement.

173. Plaintiffs suffered great injury to their business or property by reason of Defendants violation of 18 U.S.C. § 1962(c) and Defendants' racketeering activity was a proximate cause of Plaintiffs' injury.

174. As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(c), Plaintiffs are entitled to recover treble damages, costs, and reasonable attorney's fees pursuant to 18 U.S.C. § 1964(c).

**TENTH CLAIM FOR RELIEF**
**Accounting**
**(As Against All Defendants)**

175. Plaintiffs reaffirm, reallege, and incorporate by reference paragraphs 1 through 174 above as if fully set forth herein.

176. Defendants received and have controlled substantial sums of money and assets belonging to or in which Plaintiffs have an equitable interest, including Plaintiffs' investment capital contributions, Defendant Chen's purported $52 million equity

contribution, Fraudulent Loan proceeds, operating revenues from the Hotel and the Restaurant, and any proceeds or consideration received in connection with any foreclosure, UCC sale, or transfer of the Project's assets, including the Loan and Equity Collateral.

177. Plaintiffs are entitled to a full and complete accounting from Defendants to determine: (a) the total amount of funds raised from all 171 EB-5 investors in the Project; (b) the uses and ultimate destinations of those funds; (c) the terms, proceeds, and disbursements associated with the Fraudulent Loan; (d) all revenues or losses generated by the Project; and (e) all amounts obtained or retained by Defendants in connection with any foreclosure, UCC sale, or asset transfer of the Loan and Equity Collateral.

178. Plaintiffs therefore request that the Court order Defendants render a full and detailed accounting of all funds and assets related to the Project and to Plaintiffs' investments, and to pay over to Plaintiffs any amounts found to be due and owing as a result of such accounting.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for judgment against Defendants, jointly and severally, as follows:

1. Actual and consequential damages resulting from Defendants' unlawful acts in violation of Sections 10(b) and 20(a) of the Exchange Act, in an amount of no less than $24,705,000, or such greater amount as may be established at trial;

2. Actual and consequential damages resulting from Defendants' unlawful acts in violation of Section 25401 of the California Corporations Code, in an amount of no less than $24,705,000, or such greater amount as may be established at trial;

3. Actual and consequential damages resulting from Defendants' unlawful fraud, or in the alternative, resulting from Defendants' negligent misrepresentation, in an amount of no less than $24,705,000, or such greater amount as may be established at trial;

COMPLAINT

4. Actual and consequential damages resulting from Defendants' breaches of fiduciary duties owed to Plaintiffs, in an amount of no less than $24,705,000, or such greater amount as may be established at trial;

5. Actual and consequential damages resulting from Defendants' breaches of contract, in an amount of no less than $24,705,000, or such greater amount as may be established at trial;

6. For treble damages, costs of this litigation, and reasonable attorney's fees pursuant to 18 U.S.C. § 1964(c), in an amount of up to $74,115,000 based on Plaintiffs' presently alleged actual damages of $24,705,000, together with the costs of this action and reasonable attorneys' fees, provided that Plaintiffs shall not obtain a duplicative recovery of the same actual damages under multiple causes of action;

7. For rescission of Plaintiffs' investment capital, in an amount of no less than $24,705,000, or such greater amount as may be established at trial;

8. For pre-judgment and post-judgment interest;

9. For attorneys' fees;

10. For costs of this litigation;

11. For punitive and exemplary damages in an amount to be proven at trial pursuant to California Civil Code § 3294; and

12. For any other such relief as the Court determines Plaintiffs are entitled to or should receive.

Dated: July 22, 2026                    Respectfully Submitted,

DGW KRAMER LLP
By: /s/Ronghua Guan
Ronghua Guan, Esq. (SBN 333069)
ronghua@dgwllp.com
777 S. Alameda St. 2nd Floor
Los Angeles, CA 90021
T: (213) 592-1908
*Attorneys for Plaintiffs*

53

COMPLAINT